No. 87,558

STATE OF KANSAS, *Appellee*, v. AHMON MANN, *Appellant*.
(56 P.3d 212)

Opinion filed October 25, 2002.

*J. Michael Redmon*, of Kansas City, argued the cause and was on the brief for appellant.

*Terra D. Morehead,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Appellant Ahmon Mann appeals his conviction for first-degree murder. Mann was sentenced to life in prison with no possibility of parole for 25 years. Mann claims that (1) the trial court failed to instruct the jury on eyewitness identification; (2) he was denied his constitutional right to be present at critical stages of his trial; (3) the prosecutor engaged in reversible prosecutorial misconduct; (4) the trial court failed to instruct the jury on the lesser offense of voluntary manslaughter; (5) his trial counsel was so ineffective as to deny him a fair trial; and (6) he was denied his statutory right to a speedy trial.

At 10:11 p.m. on April 17, 2000, Officer Conrad Martin received a call that shots had been fired from a car. Upon arriving at the scene, Officer Martin discovered a car in the intersection of 40th and Minnie with its headlights on and its front and rear passenger doors open. Robert Diaz was sitting on the driver's side of the car. Diaz had suffered multiple gunshot wounds and was dead. The car reportedly had sat in the intersection for 10 minutes with the doors open and lights on before the police were called.

Discussions with two women, who desired to remain anonymous, caused police to look for Loren Artis. The two women had provided a description of Artis and an address that he frequented.

On April 20, 2000, police located Artis with the help of Dorothy Dean, a woman who had taken Artis in and had allowed him to stay with her on occasion. After an interview with Artis, police arrested Ahmon Mann.

Mann gave a taped statement to the police after his arrest. Mann told police that at the time of the shooting he had been at Walter Coleman's house waiting for Coleman to return home. Coleman lived a few houses from where Diaz' car was found. Mann was charged with first-degree premeditated murder in violation of K.S.A. 21-3401. A 5-day jury trial was held beginning January 29, 2001.

Artis testified that on the evening of the shooting, while selling narcotics on the corner of 40th and Minnie, he saw a car approach the intersection. Artis observed Robert Diaz driving the vehicle, Mann ("Duke") sitting in the front passenger seat, and Reggie Golden ("Red Man") sitting in the back passenger side seat. The streetlight at the intersection allowed Artis to see the vehicle's occupants. The men in the car looked to be having a conversation and were not observably fighting.

The car stopped at the intersection's stop sign and moved forward into the intersection. Artis saw Mann reach for something towards his waist. Mann and Diaz struggled briefly. Artis then saw a couple of flashes and heard gunshots. Artis testified that he did not see a gun. Mann and Golden then jumped out of the car, leaving the car doors open, and ran away. Mann was wearing a black or blue jumpsuit and Golden was wearing a red jacket and sky blue pants. Artis then approached the car and saw the driver's window was shattered and Diaz, who appeared to be dead, leaning over in the seat. Artis ran to Dorothy Dean's house, but did not tell anyone what he observed because he was scared.

While outside Dean's house, Artis saw Walter Coleman sitting in a vehicle. Coleman told Artis that he was waiting for Mann, who Coleman thought was visiting Patrice Seawood, Dean's next door neighbor and the mother of Mann's daughter. Artis later observed Mann come out of and from around the side of Seawood's house and get into Coleman's vehicle. The vehicle then left the area.

Artis knew Mann and Golden from the neighborhood and had had occasion to speak to them. Artis testified that the different drug selling groups within the neighborhood would occasionally argue about customers or territory. Artis claimed that he was not involved in any arguments or feuds with Mann or Golden.

Diaz had arrived home at approximately 9:15 p.m. that evening. Both Ernesta Diaz, his wife, and Ernesta's mother, Annie Mc-Kelvy, were home at the time. Approximately 5 minutes later, there was a knock on the door. Annie observed a young man she did not recognize at the door and assumed the man was there to see Diaz. Diaz opened the door, spoke to the man, then went into the bedroom to talk with Ernesta. Diaz asked Ernesta for $2 to go to the

store, took the $2, and left the house. At approximately midnight, Ernesta and Annie were informed by three men, one of whom was Walter Coleman, that Diaz was dead.

Diaz had suffered 7 gunshot wounds to the body. Four of the wounds were to the right side of his head and neck, with 3 of the 4 located behind the right ear. The wounds behind the right ear were intermediate shots, inflicted at a distance of somewhere farther than contact but closer than 2 to 3 feet. The shot to the neck area was inflicted at closer range. Erik Mitchell, a forensic pathologist, testified that he was unable to determine whether the shooter was in the front or back seat at the time of the shooting. Mitchell also testified that based upon the positioning of the wounds it was unlikely that the victim struggled with the shooter.

Five .380 caliber cartridge cases, all fired from the same weapon, were recovered from both the front and back seats of Diaz' car. Sally Grew, a firearm and tool marks examiner with the Federal Bureau of Investigation (FBI), testified that she did not believe it unusual that the cartridge cases were found in both the front and back seats. She testified she was unable to determine the location of the shooter from the placement of the cases.

The broken glass behind the car indicated that the car rolled slightly after the firing of some shots. Latent prints recovered from the car's passenger side did not match those of Diaz, Mann, or Golden. No other prints were recovered from the scene. Police recovered a blue jumpsuit from Seawood's house. Golden's red jacket was also recovered. No traces of blood were found on these items.

Walter Coleman was on his way home that evening from the Osage County jail. When Coleman arrived in town, the shooting had already occurred and there were police cars at the scene. According to Coleman's mother, Joyce Winfield, Mann was waiting for Coleman when Coleman arrived. Winfield originally told police that two men had come to visit Coleman that night.

Bruce Wilson ("Little B"), Golden, and Mann were close friends, often referring to themselves as brothers. When Little B's sister was killed in September 1999, Little B and Mann had t-shirts made with her picture. Diaz was implicated in Little B's sister's murder,

but the charges against him were later dismissed. Diaz was incarcerated from October 1999 to March 13, 2000. These dates closely coincide with Little B's sister's murder and Diaz' subsequent murder.

Golden testified that on the day of the shooting he wore a dark blue jumpsuit and a red jacket. Golden had previously told police he had been wearing light blue pants. Golden got the nickname "Red Man" because he frequently wore a red jacket. Golden first testified that he saw Diaz early on the morning of the shooting, but that he did not see him the rest of the day or that evening. Golden later testified that around noon he had tried to buy marijuana from Diaz while Diaz was in Diaz' vehicle. Golden stated that he did not find out about the shooting until later when his girlfriend Danella told him. Golden saw Mann on and off throughout the day of the shooting, meeting to smoke cigarettes or do drugs. He denied seeing Little B that day. Mann had told Golden that that evening he would be waiting for Walter Coleman to return home from jail. Mann had given Coleman's mother the money for Coleman's bond.

A video surveillance tape showed Diaz purchasing beer from a liquor store at approximately 9:39 p.m. that evening. The surveillance video from the attached convenience store showed Golden in that store at 9:37 p.m. The two stores share the same parking lot. Annie McKelvy identified Golden from the surveillance video photo as the man that had come to the door that night and spoke with Diaz. Golden admitted being in the convenience store, but denied seeing Diaz. Golden also admitted that he was in the parking lot near Diaz' residence just minutes before going to the convenience store but denied having gone to Diaz' house that evening.

Golden was also charged with the first-degree murder of Diaz. However, the charges against him were dismissed following the preliminary examination. At trial, Golden testified that he and Mann were in the business of selling drugs together; that there had been a dispute over territories with other sellers; that he and Mann were involved in a dispute with Jason, Dorothy Dean's son; and that Artis was a good friend of Jason and had participated in the altercations over territory.

Approximately 30 minutes to an hour after Telisha Grant, a friend of Mann's, learned of the shooting, Danella, Golden's girlfriend, told Grant that Mann would pay Grant $20 to take Little B home. Grant agreed. Little B came over to Grant's house and Grant drove him home.

Patrice Seawood testified that after she arrived home from work that evening at approximately 11 p.m., she spoke to Mann on the phone. Mann told her he was at Walter Coleman's house. Seawood was unaware of Mann having any disagreements with Diaz, but she knew that Mann had had disagreements with Jason in the past.

Deborah Allen testified that when she arrived home between 10:05 and 10:15 p.m. that evening, she noticed Mann standing in front of Walter Coleman's house. A few minutes later, Allen saw Diaz's car drive down the street.

Mann testified that he went to Walter Coleman's house between 9:30 and 10 that night to wait for Coleman. While outside Coleman's house, he saw the woman across the street (Deborah Allen) arrive home. While waiting he also saw emergency vehicles approaching the area of where Diaz was shot and observed the streets being blocked off by police. When Coleman arrived, he informed Mann that someone had been killed up the street. Mann testified that the last time he had seen Diaz and Diaz' car was that morning when he purchased marijuana from Diaz. Mann had told the police that he had purchased marijuana from Diaz around noon that day. Mann denied having earlier told the police that he had seen Diaz in Diaz' vehicle. A receipt showed Diaz' vehicle was dropped off for repairs at 8:18 on the morning of the shooting and was released at 5:06 that evening.

Mann admitted that he had often had arguments with Jason, Artis, and others over drug territory in the past, but claimed he had not associated or had any disputes with Diaz. He denied having any vendetta against Diaz because of Little B's sister's death, testifying that he was not aware at the time of the shooting that Diaz had been charged in her death. Mann admitted that he was wearing the jumpsuit that was tested for blood stains, but stated that that was what he wore nearly everyday. Mann denied seeing Little B the night of the shooting.

Krystal King, a friend of Mann's, testified that she saw Mann, Golden, and Little B in the parking lot outside Diaz' house the night before the shooting. Previously, King had told police that she had seen Mann, Golden, and Little B in the parking lot at approximately 9 p.m. on the night of the shooting. King testified that the date in her statement to the police was incorrect and had been suggested by the police officers conducting the interview. King stated that Mann had called her after the evening news the night of the murder to tell her about the incident. Mann told King that "police were everywhere and some dude got shot."

The jury found Mann guilty of first-degree murder. Mann was sentenced to life with no eligibility of parole for 25 years. Mann appealed his conviction. This court has jurisdiction over the appeal pursuant to K.S.A. 22-3601(b)(1).

## EYEWITNESS IDENTIFICATION INSTRUCTION

Although defense counsel did not request an eyewitness identification instruction at trial, Mann now asserts that the trial judge erred in failing to give the instruction. Kansas law provides that no party may assign error in the giving or failing to give an instruction absent a specific objection being lodged prior to the jury retiring to consider its verdict unless the instruction or failure to give the instruction is clearly erroneous. K.S.A. 2001 Supp. 22-3414(3). The reviewing court must be firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred for the failure to instruct to be clearly erroneous. *State v. Saenz,* 271 Kan. 339, 346, 22 P.3d 151 (2001); *State v. Scott,* 271 Kan. 103, 110-11, 21 P.3d 516, *cert. denied* 534 U.S. 1047, 151 L. Ed. 2d 550 (2001).

This court has stated that in any criminal action in which eyewitness identification is a critical part of the prosecution's case and there is serious question about the *reliability* of the identification, a cautionary instruction should be given advising the jury as to the factors to be considered in weighing the credibility of the eyewitness identification testimony. *Saenz,* 271 Kan. at 353; *State v. Richmond,* 258 Kan. 449, 455, 904 P.2d 974 (1995); *State v. Warren,* 230 Kan. 385, 397, 635 P.2d 1236 (1981); see also *State v. Gaines,*

260 Kan. 752, 758, 926 P.2d 641 (1996) (PIK Crim. 3d 52.20 promulgated as direct result of decision in *Warren*).

Mann's defense was that he was not in Diaz' car at the time of the shooting. Artis was the sole eyewitness to the crime, all other evidence was circumstantial. Artis' identification of Mann was critical to the State's case. Therefore, Mann contends the following instruction should have been given:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he)(she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused; and

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 3d 52.20.

In support of his claim that the requirements for giving an instruction on eyewitness identification were met in this case, Mann sets forth approximately 10 factual situations that question the ability of Artis to make an identification of the shooter.

The State contends an instruction on eyewitness identification was not required because Artis was personally acquainted with the defendant. In support of this assertion, the State relies upon *Saenz*, 271 Kan. 339. In *Saenz*, this court recognized that the factors set forth in *Warren* and contained in PIK Crim. 3d 52.20 contemplated that the witness did not personally know the defendant. The witness in *Saenz* had seen the defendant earlier in the evening and

knew the defendant personally. The *Saenz* court held that since the witness' reliability was not questionable, the failure to give the instruction was not clearly erroneous. 271 Kan. at 354. Just as in *Saenz*, Artis personally knew both Mann and Golden.

In addition to the fact Artis personally knew Mann, Artis' testimony as to the events of the shooting was supported by the testimony of officers arriving at and processing the scene. Artis testified that he was at a location that other testimony confirms was well-lit. Artis' identification of Mann occurred only 3 days after the incident. Artis accurately identified the clothing worn by both Mann, and arguably Golden, on the evening of the shooting. Artis testified he was positive Mann was the shooter. The defense had the opportunity to point out to the jury any discrepancies in Artis' previous statements, as well as any motive Artis might have had in making a misidentification.

The reliability of the identification and credibility of an eyewitness are not the same thing. The jury was instructed as follows regarding weight and credibility:

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

Artis' testimony does give rise to questions as to Artis' credibility. Furthermore, testimony indicated that Artis may have had a vested interest in implicating Mann and Golden in the murder based upon disagreements over drug territory. The questionable credibility of a witness, however, is not a factor in giving an eyewitness identification instruction.

Under these circumstances, an instruction on eyewitness identification was not necessary and would not have changed the result of the trial. The trial court's failure to give the instruction was not erroneous.

## RIGHT TO BE PRESENT AT CRITICAL STAGES OF TRIAL

Mann contends he was denied his constitutional right to be present during critical stages of his trial. He cites three separate occasions during the trial where communications occurred outside

his presence. The State contends these incidents were either harmless or did not constitute ex parte communications.

A defendant's constitutional right to be present during criminal proceedings stems from the Sixth Amendment to the United States Constitution right to confront witnesses and the Fifth and Fourteenth Amendments to the United States Constitution due process right to attend critical stages of a criminal proceeding in which the defendant is not actually confronting witnesses or evidence against him or her. *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871 (2000); *State v. Bowser*, 252 Kan. 582, 586, 847 P.2d 1231 (1993). The due process right to be present only exists to the extent that a fair and just hearing would be thwarted by the defendant's absence. *Calderon*, 270 Kan. at 245; *Bowser*, 252 Kan. at 586.

In addition to a defendant's constitutional right to be present during critical stages of the trial, the defendant's statutory right to be present is set forth in K.S.A. 2001 Supp. 22-3405(1), which states:

"The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law. In prosecutions for crimes not punishable by death, the defendant's voluntary absence after the trial has been commenced in such person's presence shall not prevent continuing the trial to and including the return of the verdict."

K.S.A. 22-3420(3) further provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

Mann first complains of an incident which occurred on the third day of the trial, when the trial judge had various conversations with four jurors on the record in chambers and outside the presence of either counsel or the defendant. The meetings occurred after two female jurors reported to the bailiff that a male spectator, sitting on the defendant's side of the courtroom, had followed them outside during breaks and had stared or glared at them frequently

during the course of the trial. The trial judge reported the jurors' complaint to both counsel who agreed that the judge should speak to the two reporting jurors outside the presence of counsel.

When speaking with the two female jurors the trial judge discovered that the jurors felt uncomfortable because a bald and somewhat heavy-set African-American male had been glaring at them while they were in the jury box during the previous 2 days of the trial. During a break, the two jurors had also overheard the man commenting on his cellular phone about the case and about how "they better not get anything on him because they don't have fingerprints." The women did not have an opinion on whether they believed the man was acting in a deliberate manner. The judge informed the two jurors that the man was the defendant's uncle and that defense counsel would speak with the man and tell him to stop. Both jurors stated to the judge that they would be able to be fair and impartial and make a decision based solely on the evidence and the law. They stated that the feeling of uncomfortableness regarding this man had only been discussed between the two of them and two other female jurors.

Following the same procedure, the judge then spoke with the other two female jurors who had been identified. Both jurors stated that they would be able to remain fair and impartial. These jurors were also informed that the man was the defendant's uncle and that defense counsel would speak to the man and tell him to stop.

The judge then reported the conversations he had with the four jurors to counsel and to the defendant, outside the jury's presence. The State agreed to continue with the trial. Defense counsel expressed concern with the ability of these four jurors to carry on in a fair and impartial manner. The judge offered to allow defense counsel to question each of the four jurors individually. Defense counsel declined, expressing concern that further inquiry might worsen the matter. Defense counsel noted that counsel had only consented to the judge speaking with two jurors.

The judge's recorded conversations with the four jurors were read to the defendant and both counsel. After speaking with Mann, defense counsel moved for a mistrial, contending that the fact this issue was brought to the court's attention indicated a problem with

the jurors' "line of thinking" and indicated that they were not paying attention to the evidence but to the gallery. The judge denied the motion, finding that the jurors had merely reported something that made them feel uncomfortable and had indicated that they could remain fair and impartial and that the incident would not affect their decision in this case. The judge also noted that in addition to their verbal statements, the demeanor of the jurors also indicated that they would judge the case based on the evidence and not on this event.

It is well settled that a conference between a trial judge and a juror is a critical stage of the trial at which a criminal defendant has a constitutional right to be present. *State v. Fulton,* 269 Kan. 835, 844, 9 P.3d 18 (2000); *State v. High,* 260 Kan. 480, Syl. ¶ 2, 922 P.2d 430 (1996). Although both counsel consented to the judge speaking with the two reporting jurors, this consent did not include the judge's additional conversation with the other two jurors. Additionally, and most importantly, the record does not indicate that Mann waived his right to be present at either conversation. An attorney cannot waive a defendant's right to be present at a critical stage of the proceeding without first discussing the matter with the defendant. *Crease v. State,* 252 Kan. 326, Syl. ¶ 4, 845 P.2d 27 (1993). Thus, it was error for the trial judge to have conducted these conversations with jurors outside Mann's presence. The question is whether this error was harmless.

In *Calderon,* this court addressed the issue of whether harmless error could prevent reversal once a defendant's constitutional right to be present during a critical stage of the proceeding had been violated. Calderon was found to have been denied his constitutional right to be present at a critical stage when the trial court ordered the interpreter, necessary for Calderon to understand the proceedings, not to translate closing arguments for Calderon. The court examined the distinction between trial errors, which are subject to a harmless error analysis, and structural errors, which require a new trial. In reversing Calderon's conviction, the majority of the court concluded that the failure to translate the closing arguments implicated a basic consideration of fairness and that a

harmless error analysis was inappropriate under the circumstances. 270 Kan. at 253.

The harmless error analysis was applied, however, in *State v. Lopez*, 271 Kan. 119, 134, 22 P.3d 1040 (2001). In *Lopez*, there were two instances in which the defendant contended he was denied his constitutional right to be present at a critical stage of the trial. The first instance involved the judge's conversation with counsel outside his presence prior to voir dire regarding the qualifications of potential jurors. The *Lopez* court found there was no error because the conference did not constitute a stage of trial under K.S.A. 2001 Supp. 22-3405(1). 271 Kan. at 130-31. The second instance occurred during voir dire on the second day of trial when the judge, both counsel, and a juror convened outside the defendant's presence. Because the record did not indicate Lopez had waived his right to be present and the conversation involved questioning of a potential jury member, error was found to exist. The conversation involved questioning of the juror regarding a report that he might know a member of the victim's family. The juror denied knowing such a person and indicated that he would come forward if he recognized anyone in the audience and that even if he did recognize someone he could remain fair and impartial. The *Lopez* court, in a unanimous decision, held that Lopez was not denied a meaningful presence at a critical stage of his trial and that his absence did not implicate a basic consideration of fairness or undermine the function of a criminal trial, thus the error was not structural and a harmless error analysis was applied. 271 Kan. at 134.

In this case, the judge's conversation with the four jurors did not implicate a basic consideration of fairness or undermine the function of a criminal trial. Thus, this was not a structural error, but rather a trial error to which application of the harmless error analysis is appropriate.

"The denial of a defendant's constitutional right to be present at all critical stages of the trial is subject to a constitutional analysis to determine if the error was harmless. Before an error of constitutional magnitude may be declared harmless, the appellate court must be able to declare beyond a reasonable doubt that

the error had little, if any, likelihood of having changed the result of the trial." *State v. Rayton*, 268 Kan. 711, 717, 1 P.3d 854 (2000).

Kansas has adopted the following four-factor test for analyzing the effect of ex parte communications with the jury: (1) the overall strength of the prosecution's case; (2) whether an objection was lodged; (3) whether the ex parte communication concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter and the manner in which it was conveyed to the jury; and (4) the ability of a post-trial remedy to mitigate the constitutional error. *Rayton*, 268 Kan. at 717; *State v. McGinnes*, 266 Kan. 121, 132, 967 P.2d 763 (1998).

### Strength of Prosecution's Case

The prosecution's case was almost entirely based upon Artis' eyewitness testimony. There was no physical evidence suggesting Mann was involved in the shooting. There was also defense testimony that placed Mann at Coleman's house just prior to the shooting. Thus, the evidence against Mann was less than overwhelming.

### Objection to the Ex Parte Communication

There was no objection to the ex parte communication in this case. The judge informed both counsel of the complaint received by the bailiff and both counsel consented to the judge speaking privately with the two complaining jurors. Even after the judge spoke with the jurors, the only complaints defense counsel lodged were that the consent had been limited to speaking with two jurors and that the fact the jurors complained indicated a problem. The request for a mistrial was not based upon the content of the ex parte communication itself, but upon the information obtained in that communication.

### Contents of the Ex Parte Communication and Manner Communicated

The communication did not concern the evidence. The communication was significant, however, because it involved possible juror prejudice and the ability of the jurors to objectively evaluate the evidence after feeling threatened. See *Rayton*, 268 Kan. at 719.

Although erroneous, the ex parte communication, or at least part of it, was communicated with the consent of both the State and defense counsel. The communication was also recorded and available for both counsel and the defendant to examine.

### Ability of Post-Trial Remedy to Mitigate Error

Mann's motion for new trial alleged the court erroneously denied the motion for mistrial made after the four jurors expressed fears of Mann's uncle. The motion alleged the jurors were prejudiced in their opinion of Mann and were erroneously permitted to continue serving as jurors. The motion was denied.

A factually similar case is that of *Rayton*, 268 Kan. 711. In *Rayton*, the trial judge, in response to a juror's concerns about the presence of two young black males in and about the courthouse who had been staring at the jurors, invited the complaining juror and one other juror into his chambers to discuss the problem. The jurors stated their concerns and the trial judge recounted the concerns to the parties. One of the males was the defendant's younger brother and the sole defense witness. Defense counsel requested that the judge inquire of the jurors whether their ability to decide the case on the evidence had been compromised. The State agreed. *The defendant waived his right to be present at this inquiry.* The majority of the inquiry was recorded; however, the judge did go off the record at one point. The jurors assured the judge that their ability to decide the case based on the evidence had not been compromised. The judge related this second conversation to the parties and the transcript of the conversation was read back. The defense moved for a mistrial on the basis that the jurors had identified the defendant's younger brother as one of the intimidators, the jurors were terrified despite what they told the court, and the defendant would receive less than a fair trial. The judge denied the motion, stating that in his opinion the jurors would be able to decide the case based on the evidence. On appeal, this court applied the four-factor test and held that there was little, if any, likelihood that the ex parte communications changed the result of the trial. 268 Kan. at 717-20.

It can be said beyond a reasonable doubt that this error had little, if any, likelihood of changing the result of trial. The failure to include Mann in these two conversations with the jurors was harmless.

The second complained-of incident occurred when the trial judge conversed on the record with both counsel outside the presence of the defendant and the jury. The conversation occurred as a result of the jury requesting equipment to view a videotape in evidence. The videotape contained video from both the crime scene and the autopsy of the victim. Only the crime scene video had been shown to the jury and admitted into evidence. On the record, the trial judge noted that the prosecutor had made a duplicate tape that included only the video from the crime scene. Defense counsel agreed to the submission of the duplicate video to the jury. The duplicate videotape and the viewing equipment were then provided to the jury.

Mann contends this was an improper ex parte communication with jurors. The judge did not, however, communicate with the jury on this occasion.

The defendant's constitutional right to be present extends only to those stages of the criminal proceeding that are critical to the outcome and at which the defendant's presence would contribute to the fairness of the procedure. *Calderon*, 270 Kan. at 245. It is difficult to imagine, and Mann does not contend, that his presence at this particular conference among the judge and both counsel outside the presence of the jury could have contributed in any way to the fairness of the procedure. Mann merely relies upon the fact that he was not present and that the court made a decision during that time. This conversation was merely engaged in for the purpose of recording an evidentiary issue, and no decision was made that would have affected the trial's outcome. Mann did not have a constitutional or statutory right to be present under these circumstances.

The third complained-of incident occurred when the jury requested a readback of testimony. The trial judge received the request and believed that one of the items requested to be read back was vague. The jury had requested "Loren Artis - Defense answer

testimony." Because neither counsel was present, the trial judge, by note, asked the jury the following question: "Regarding your first request by defense answer testimony, do you mean the cross-examination of Mr. Artis by Mr. Lewis [defense counsel] or something else?" The jury responded, stating that they wanted the cross-examination of Artis by defense counsel. The following day, outside the presence of the jury, the judge informed both counsel and Mann of the communication. Neither party objected. The testimony was then read back to the jury in Mann's presence, and the jury retired to continue its deliberations.

The State contends this did not constitute an ex parte communication with the jury. Additionally, the State cites *Scott*, 271 Kan. 103, in support of its claim that this communication with the jury was harmless, noting that the judge's comment was not an answer and that the question did not involve the law or evidence. In *Scott*, the jury sent a question to the trial judge inquiring whether all the definitions in Instruction No. 12 pertained to premeditation. Without notifying counsel, the judge responded that Instruction No. 12 defines terms used throughout the instructions. The judge notified both counsel of the question and his response after the jury returned with a verdict. No objections were made. The *Scott* court held the judge's response to the jury's question was legally correct and completely innocuous. Although the response to the jury outside the defendant's presence was error, the court concluded beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. 271 Kan. at 112-13.

The absence of Mann at this particular time did not implicate a basic consideration of fairness or undermine the function of a criminal trial. Thus, the court will apply a harmless error analysis. Once again, it is difficult to image how Mann's presence on this occasion could have changed the result of the trial. After the readback of the testimony, the jury foreman indicated that that was all the testimony the jury had wanted to be read back. Any misunderstanding or miscommunication could have been remedied at that point. Therefore, this court finds beyond a reasonable doubt that this contact with the jury also had little, if any, likelihood of having

changed the result of trial. The judge's contact with the jury on this occasion was also harmless.

## PROSECUTORIAL MISCONDUCT

Mann contends the prosecutor improperly expressed opinion as to Mann's guilt in making the following statement during the State's closing argument:

"The [S]tate believes that [Diaz] was killed with premeditation intentionally, first degree, and this is why."

Defense counsel did not object to this statement.

Reversible error predicated on prosecutorial misconduct must be of such magnitude that it denies a defendant his or her constitutional right to a fair trial. *State v. Pabst*, 268 Kan. 501, 504, 996 P.2d 321 (2000). Reversible error generally cannot be based upon misconduct by the prosecutor during closing argument where no contemporaneous objection is lodged. If, however, the prosecutor's statements violate a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *State v. Henry*, 273 Kan. 608, Syl. ¶ 4, 44 P.3d 466 (2002).

Analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, it must be determined whether the remarks are outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in both the language and in the manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, it must be determined whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *Pabst*, 268 Kan. at 505; *State v. Lumley*, 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999).

Mann contends that it was improper for the prosecutor to assert that the State had an opinion as to Mann's guilt. Specifically, Mann asserts the comment was prosecutorial vouching, which placed the prestige of the State behind the prosecutor's personal assurances.

The comment occurred near the beginning of the prosecutor's closing argument. Although claiming to express the opinion of the State, the comment can best be characterized as directional, with its intended purpose being to serve as an opening for the prosecutor's upcoming summation of the evidence that pointed toward Mann being guilty of first-degree premeditated murder. The prosecutor's comment is not beyond the wide latitude afforded prosecutors.

## FAILURE TO INSTRUCT ON LESSER INCLUDED OFFENSE

Mann contends the trial court erred in failing to instruct the jury on the lesser offense of voluntary manslaughter. The jury was instructed on first-degree premeditated murder and the lesser included offense of second-degree intentional murder. Defense counsel did not request the jury receive an instruction on voluntary manslaughter nor did he object to the instructions given.

K.S.A. 2001 Supp. 22-3414(3) provides in pertinent part as follows:

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous."

It is well settled that voluntary manslaughter is a lesser included offense of first-degree murder. Where there is substantial evidence to support a conviction for a lesser offense, the trial judge is required to instruct on the lesser offense. See *State v. McClanahan*, 254 Kan. 104, 109, 865 P.2d 1021 (1993); *State v. Hobbs*, 248 Kan. 342, 346, 807 P.2d 120 (1991). Thus, the only issue before this court is whether, under the evidence presented at trial, the trial court's failure to instruct the jury on voluntary manslaughter was clearly erroneous. For an instruction or the failure to instruct to be found clearly erroneous, the reviewing court must be firmly convinced that there was a real possibility the jury would have returned a different verdict if the trial error had not occurred. *State*

*v. Parker*, 273 Kan. 56, Syl. ¶ 2, 41 P.3d 789 (2002); *State v. Pierce*, 260 Kan. 859, 868, 927 P.2d 929 (1996).

> "Voluntary manslaughter is the intentional killing of a human being committed:
> "(a) Upon a sudden quarrel or in the heat of passion; or
> "(b) upon an unreasonable but honest belief that circumstances existed that justified deadly force." K.S.A. 21-3403.

Heat of passion has been defined as "any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection." PIK Crim. 3d 56.04(e). Sudden quarrel is one form of provocation for "heat of passion" and is not separate and distinct. *State v. Coop*, 223 Kan. 302, 307, 573 P.2d 1017 (1978).

In support of his contention that an instruction on voluntary manslaughter was warranted, Mann cites to the State's theory that the murder was in retribution for Diaz' murdering Little B's sister as providing the emotional background for such an instruction. Additionally, Mann relies upon Artis' testimony that he observed a struggle between Mann and Diaz before the first shot was fired.

Artis testified that he observed Mann and Diaz involved in a struggle at some point between when the vehicle started to move forward from a stop at the stop sign and when the first shots were fired. He testified that he observed Mann make a move toward his waist and then saw the flashes. Artis also testified, however, that the struggle lasted only a "second" and that prior to this the occupants of the car appeared to have been having a conversation and did not appear to have been fighting. It must also be noted that Mann testified that he did not know that Diaz had been a suspect in Little B's sister's murder. Therefore, there is no evidence that would support an instruction on voluntary manslaughter because there is no evidence that would support Mann having been in such an emotional state of mind that he acted on impulse without reflection.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Mann contends his trial counsel was so ineffective that he was denied his right to a fair trial. To support this claim, Mann cites 14

actions or inactions of his defense counsel that demonstrate to a reasonable probability that the result of the proceeding would have been different if counsel had not made these errors. In the alternative, Mann asserts this court should remand the case back to the trial court for consideration of the issue. The State maintains because the issue is raised for the first time on appeal, the matter is not properly before this court. Alternatively, the State contends that even if defense counsel made errors in representing Mann, there is no reasonable probability the result of trial would have been different.

The notice of appeal in this case was filed by trial counsel and requested that appellate counsel be appointed. Appellate counsel filed the docketing statement on August 23, 2001. Appellate counsel filed a motion for remand on January 8, 2002, almost 10 months after the notice of appeal was filed and 4 days after filing the brief in this case. No explanation was provided for the over 4 months that passed between the appointment of appellate counsel and the filing of the motion for remand. We denied the motion for remand because it was not timely filed.

We have stated that an allegation of ineffective assistance of counsel will not be considered for the first time on appeal. *State v. Johnson*, 258 Kan. 475, 488, 905 P.2d 94 (1995); *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986). The reasoning behind this practice was stated in *Van Cleave*, 239 Kan. at 119:

"The principal problem facing an appellate court when a claim of ineffective assistance of counsel is raised for the first time on appeal is that the trial court, which observed counsel's performance and was aware of the trial strategy involved, is in a much better position to consider counsel's competence than an appellate court is in reviewing the issue for the first time from a cold record. Many times what would appear in the record as an indication of ineffective counsel was fully justified under the circumstances present in the trial court. The trial judge should be the first to make a determination of such an issue and our refusal to consider the matter for the first time on appeal is sound."

The *Van Cleave* court set forth two alternate remedies for an ineffective assistance of counsel claim not raised before the trial court: (1) a motion brought pursuant to K.S.A. 60-1507; and (2) seeking remand to the trial court for determination of the issue.

239 Kan. at 119-20. See *State v. Greene*, 272 Kan. 772, 37 P.3d 633 (2001) (appellate court addressed claim of ineffective assistance of counsel on direct appeal after previously remanding to trial court for consideration of claim at request of appellate counsel while retaining jurisdiction over appeal); *State v. Orr*, 262 Kan. 312, 940 P.2d 42 (1997). We note that there are exceptions to the rule. See, *e.g., State v. Carter*, 270 Kan. 426, 433, 14 P.3d 1138 (2000); *State v. Jenkins*, 257 Kan. 1074, 898 P.2d 1121 (1995).

The test for determining whether a defendant received ineffective assistance of counsel was set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and adopted by this court in *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985).

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

Regarding the performance prong of the *Strickland* test, the *Chamberlain* court stated:

"The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 236 Kan. 650, Syl. ¶ 3(a).

With regard to the prejudice prong, the *Chamberlain* court stated:

"With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." 236 Kan. 650, Syl. ¶ 3(b).

Mann raises the following in support of his claim that his trial counsel was ineffective:

(1) Trial counsel did not subpoena any witnesses to testify. Mann relies upon the district court's case history record as support for this statement, concluding that those who did testify (Reggie Golden, Patrice Seawood, and Deborah Allen) must have just shown up and testified voluntarily. The record indicates the State issued subpoenas to Deborah Allen and Patrice Seawood on January 4, 2001. Mann does not assert that there were any additional witnesses that could have been subpoenaed or that any prejudice resulted from defense counsel's failure to subpoena witnesses.

(2) No notice of alibi was ever filed by the defense even though alibi was the defense in this case. The State contends that from the evidence at trial, Mann did not have an alibi and there is no evidence that supports that the failure to file a notice of alibi affected Mann's right to a fair trial.

We note that during trial, the prosecutor objected to Deborah Allen's testimony as being that of an alibi witness without the State being properly noticed. The trial judge overruled the objection and allowed Allen to testify to having seen an individual she believed to be Mann standing across the street at the same time she observed Diaz' car drive by her home. Allen testified her belief that the individual was Mann was based upon what she saw and upon her son having identified the individual as Mann when he later arrived at her home.

(3) No discovery motion was filed by trial counsel. The State contends there was no need for a discovery motion because defense counsel was provided unlimited access to the State's file and was

given copies of documents to which counsel was legitimately entitled.

(4) Trial counsel reserved his opening statement until the end of the State's case, and the opening statement covered just over two pages of the trial transcript, barely referring to the facts. As the State points out, this may have been part of defense counsel's trial strategy, *i.e.* playing down the facts of the case.

(5) Trial counsel was in trial the 3 weeks prior to this trial. The State cites to the fact trial counsel did not request a continuance on grounds he was unprepared and nothing in the record supports trial counsel not having been prepared.

(6) Trial counsel failed to object to the three occasions where proceedings were held outside Mann's presence. As previously discussed, these three occasions had little, if any, likelihood of changing the result of trial.

(7) Trial counsel "unnecessarily and for no reason clearly elicited damaging testimony" that Mann had a criminal record and had previously been incarcerated. The testimony cited to by Mann occurred during the direct examination of Reggie Golden and involved Golden describing how he and Mann first met in a youth center where they had been placed by the courts. As the State points out, there was no indication that trial counsel was surprised by this information, and there was no information elicited as to why Mann had been placed in the youth center.

(8) Trial counsel unnecessarily elicited evidence that Mann had an illegitimate child and that, although he lived with the mother of this child, he also had other girlfriends at the same time. As the State points out, this information was nothing other than part of defense counsel's strategy. Mann's relationship with Patrice Seawood was definitely relevant, as Seawood was to testify as to Mann's whereabouts. Krystal King was a friend of Mann's. Potentially, this same information could have been elicited by the State and been received more negatively by the jury than if defense counsel had not elicited such testimony on direct examination.

(9) Trial counsel failed to object to the prosecutor's statement during closing argument that "the state believes that he was killed with premeditation, intentionally, first degree, and this is why." As

discussed previously, this statement did not result in reversible prosecutorial misconduct, thus no error can be found in defense counsel's failure to object.

(10) Trial counsel failed to object to the testimony of two witnesses (Telisha Grant and Joyce Winfield) who were not endorsed by the prosecution. The State agrees these witnesses were not endorsed and that Mann's trial counsel failed to object. The State points out, however, that the trial court has discretion, even over an objection, to allow late endorsement of witnesses by the State.

The purpose of endorsement is to prevent surprise to the defendant and to allow the defendant the opportunity to interview the prosecution's witnesses prior to trial. *State v. Green*, 252 Kan. 548, 553, 847 P.2d 1208 (1993). The test with regard to the late endorsement of witnesses is whether the defendant's rights have been prejudiced. *State v. Kendig*, 233 Kan. 890, 891, 666 P.2d 684 (1983). Factors in making this determination include whether the defendant was surprised and whether the testimony was critical. *State v. Coleman*, 253 Kan. 335, 856 P.2d 121 (1993). The record does not indicate Mann's counsel was surprised by the testimony of these two witnesses. Grant testified as to Mann's close relationship with Little B and that she had given Little B a ride home, supposedly at Mann's request, the night of the shooting. Winfield testified that Mann was waiting for Walter Coleman when she returned home after picking Coleman up from jail. Although this testimony circumstantially supported Mann's having committed the crime, the evidence was not critical to Mann's conviction.

(11) Trial counsel failed to file any written request for instructions before trial, never requested any additional instructions orally, and failed to request a cautionary instruction on eyewitness identification. As previously discussed, the failure to instruct the jury on eyewitness identification was not clearly erroneous. It must also be noted that in addition to Artis' eyewitness identification, Deborah Allen identified Mann as being the individual she observed standing outside her neighbor's house at the same time she observed Diaz' car drive down the street. Allen only saw an outline of the individual's face from a distance in the dark. Any request for a cautionary instruction on eyewitness identification could have

potentially resulted in the jury giving less credence to Allen's testimony in favor of Mann.

Mann also challenged trial counsel's failure to request an instruction on voluntary manslaughter; however, as previously discussed, failure to give this instruction was not clearly erroneous. Mann fails to identify any other specific instructions that defense counsel failed to request either orally or in writing or identify how he was prejudiced.

(12) Trial counsel did not object to hearsay evidence—the Firestone invoice indicating Diaz' car was being repaired the entire day of the shooting. The State points out that Mann does not cite any legal basis for his conclusion that this receipt was hearsay evidence. Furthermore, the State contends the receipt was a business document which would have been admissible with testimony from a Firestone employee. During closing argument, trial counsel for Mann noted that no one knew for sure where Diaz' car was on the day of the shooting, pointing to the fact that all they had was a piece of paper (the receipt). The decision to not object, as the State hypothesized, was most likely a part of defense counsel's strategy to ensure the accuracy of the receipt was not legitimized by employee testimony.

(13) Trial counsel failed to closely examine the State's file and was unaware of the existence, until after trial began, of two witnesses that saw Artis near the scene of the shooting. The State cites to the fact these witnesses desired to remain anonymous, contending there was nothing in the record that would have allowed for these witnesses to be readily identified. Thus, the State contends there is nothing to indicate that anything different could have been done if trial counsel would have been aware of these witnesses.

It must be noted that upon hearing about these two witnesses and how they had led the police to Artis, trial counsel immediately objected on the grounds it was confidential informant testimony. On cross-examination, trial counsel for Mann discovered the witnesses were two African-American females, one in her mid-20's and the other in her mid-40's who were driving a brown four-door Ford Escort. The police report concerning these two anonymous witnesses was available to defense counsel.

Defense counsel then moved for a mistrial on the grounds these witnesses were confidential informants. The substance of the anonymous witnesses' statements was that they observed what they believed to have been an accident and saw a man, later determined to be Artis, wearing a jacket with glitter on it that they thought might have been glass. The women told police they believed the man might have been involved in the accident; that the right side of the man's jacket, front and back, appeared to be wet; and that the man was holding his right arm as if he was injured. The judge denied the motion for mistrial. The judge also ordered the detective who testified as to the existence of these witnesses to provide as much information as possible to defense counsel so that these witnesses could be subpoenaed. No additional information was available and the witnesses never testified.

(14) Trial counsel for Mann did not speak with Deborah Allen, the defense's key alibi witness, until 9:30 or 10 the night before she testified; did not speak with Allen's son, who served as a part of the basis upon which Allen concluded she had observed Mann standing across the street; and did not call Walter Coleman or Larry Anderson (who was with Allen outside her house that night). The State contends Allen did not provide an alibi for Mann and that there is nothing to suggest an earlier interview with Allen would have changed the result of the trial. The State also notes that the evidence at trial did not clearly show that Allen's son saw Mann that evening; thus, there is nothing that would indicate that subpoenaing him would have changed the result of the trial.

After reviewing the record, we find Mann's trial counsel was effective. Mann was not denied effective assistance of counsel or a fair trial.

## RIGHT TO SPEEDY TRIAL

Mann contends that he was denied his statutory right to a speedy trial. The State asserts that this right was not violated because Mann had other charges pending against him while awaiting trial on this matter. A violation of statutory and constitutional rights to a speedy trial is a question of law over which this court has unlim-

ited review. *State v. Smith*, 271 Kan. 666, 681, 24 P. 3d·727, *cert. denied* 534 U.S. 1066, 151 L. Ed. 2d 582 (2001).

Pursuant to K.S.A. 22-3402(1):

> "If any person charged with a crime and *held in jail solely by reason thereof* shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of application or fault of the defendant, or a continuance shall be ordered by the court. . . ." (Emphasis added.)

From the record on appeal, it appears that Mann was arrested on or about June 30, 2000. Mann was arraigned on August 21, 2000, and held in custody until trial. Trial did not begin until January 29, 2001, 161 days after Mann was arraigned. The record does not indicate any request by the defense for a continuance, nor does it indicate Mann waived his right to a speedy trial.

On November 29, 2000, 100 days after Mann's arraignment, defense counsel filed a motion to dismiss the case on the grounds Mann had not been brought to trial within 90 days as required by K.S.A. 22-3402(1). A hearing on the motion to dismiss was held January 2, 2001. At the time of the hearing, Mann was being held in custody on charges in two separate cases. Mann had been arraigned in the first case, 99 CR 2395, on July 13, 2000, for aggravated battery. According to defense counsel, the trial in 99 CR 2395 was originally set for October 9, 2000, but was continued at the defense's request due to defense counsel's unavailability. The case was not reset for trial until January 29, 2001. According to the record, the second case, 00 CR 1047A, the subject of this appeal and for which the arraignment was held August 21, 2000, was never set for trial. The prosecutor stated at the hearing that trial was set as soon as possible after discovering this error. The trial was set for January 29, 2001, in that case as well.

The prosecutor contended at the hearing that because Mann was being held in jail on 99 CR 2395 and not solely as a result of 00 CR 1047A, the statutory speedy·trial period did not apply. The district judge noted that this case, 00 CR 1047A, had not been brought to trial within the statutory speedy trial period and determined that the trial date set in 99 CR 2395 was not reasonable

because it exceeded 90 days from the date of the continuance. The judge noted that the only thing that would justify the trial date set in either of the cases is the fact Mann was being held on the other case. The judge took the matter under advisement and allowed the parties to submit briefs. The record does not contain the briefs, if any, that were submitted to the court on this issue.

Prior to jury selection, the trial judge made the following statement:

"I've told counsel informally that the defendant's motion to dismiss on speedy trial grounds was denied. I've not had an opportunity to write an order or decision. What I will do is just state on the record at some convenient point early on in the trial the reasons why the motion to deny was entered or why the motion was denied rather."

The record does not appear to contain, nor do the parties cite to, any subsequent reference to the denial of the motion to dismiss.

Mann concedes that the statutory right to speedy trial does not apply to a criminal defendant being held in custody for any reason other then a criminal charge. Mann contends, however, that the statutory right to speedy trial still exists when the defendant is being held on only criminal charges. Mann asserts that to hold otherwise would relieve the State of the requirement to bring a defendant to trial within a specific time frame when a defendant is faced with more than one charge.

The State asserts that the provisions of K.S.A. 22-3402 do not apply when there are other charges pending against the accused, citing for support *Smith*, 271 Kan. at 682, and *State v. Strong*, 8 Kan. App. 2d 589, 663 P.2d 668 (1983). The State contends Mann's constitutional right to a speedy trial was also not violated.

This court has clearly established that the statutory right to speedy trial does not apply to criminal defendants who are held in custody for any reason other than the subject criminal charge. *State v. Ruff*, 266 Kan. 27, Syl. ¶ 3, 967 P.2d 742 (1998). The statutory right to a speedy trial has been found not to apply under the following circumstances: *Smith*, 271 Kan. at 682 (when defendant was also being held on federal detainer); *Ruff*, 266 Kan. at 31 (where at time of arraignment and until trial defendant was incarcerated on prior conviction); *State v. Abel*, 261 Kan. 331, 334, 932 P.2d

952 (1997) (where defendant was being held in jail for a parole violation); *State v. Hill*, 257 Kan. 774, 778, 895 P.2d 1238 (1995) (where prior to defendant's arraignment defendant's parole officer placed a state arrest and detain order against defendant); *State v. Sanders*, 224 Kan. 138, 140, 578 P.2d 702 (1978) (where between time of arraignment and trial defendant was in custody by virtue of sentences against him); and *Strong*, 8 Kan. App. 2d at 593 (where there were numerous other charges pending against defendant and where defendant was convicted of felony during period between arraignment and trial and was being held in custody pending his sentencing).

The application of K.S.A. 22-3402(1) to a defendant held in custody simultaneously on charges in another case was specifically addressed in *State v. Goss*, 245 Kan. 189, 777 P.2d 781 (1989). In *Goss*, the defendant was arraigned on February 27, 1987. The jury trial did not commence until October 14, 1987. On March 6, 1987, while in jail on the charges in that case, defendant was served with a second criminal warrant involving unrelated burglary and theft charges. The *Goss* court held that, therefore, the defendant was held solely on that case for only 1 week between arraignment and trial and that the defendant did not meet the requirement of being " 'held in jail solely by reason thereof' " pursuant to K.S.A. 22-3402(1). 245 Kan. at 191.

The plain language of K.S.A. 22-3402(1) provides that the 90-day right to be brought to trial applies only when the defendant is charged with a crime and held solely on the basis of that charge. Mann was not held solely on the basis of the murder charge against him in this case. Therefore, K.S.A. 22-3402(1) did not apply.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and Section 10 of the Kansas Constitution Bill of Rights guarantee an accused the right to a speedy trial. *Ruff*, 266 Kan. at 31. The Kansas Legislature adopted K.S.A. 22-3402 to define and implement these constitutional guarantees. *Strong*, 8 Kan. App. 2d at 591; see *State v. Pendergrass*, 215 Kan. 806, Syl. ¶ 1, 528 P.2d 1190 (1974). Where the statutory right to speedy trial does not apply, an accused

is still guaranteed the right to a speedy trial under both the United States and Kansas Constitutions.

The United States Supreme Court set forth a balancing test for determining whether an accused has been denied his or her constitutional right to a speedy trial in *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972). Kansas adopted this test in *State v. Otero*, 210 Kan. 530, 502 P.2d 763 (1972). The following factors were set forth in *Barker*: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. 407 U.S. at 530.

Until the delay rises to the level of being presumptively prejudicial, it is not necessary to inquire into the other *Barker* factors. *Ruff*, 266 Kan. at 32; *Hill*, 257 Kan. at 778. The delay between arrest and trial in this case was approximately 7 months. A delay of 7 months is not presumptively prejudicial. See *Hill*, 257 Kan. at 779 (less than 11-month delay between arrest and trial not presumptively prejudicial); *Goss*, 245 Kan. at 193 (little over 1 year between arrest and trial not presumptively prejudicial). Therefore, we need not consider the additional *Barker* factors. Mann's constitutional right to a speedy trial was not violated.

Affirmed.

LARSON, S.J., assigned.