NOT DESIGNATED FOR PUBLICATION

No. 126,966

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JUSTIN W. HAMMOND,
*Appellant*.

MEMORANDUM OPINION

Appeal from Pawnee District Court; BRUCE GATTERMAN, judge. Oral argument held May 20, 2025. Opinion filed August 1, 2025. Affirmed.

*Jonathan Laurans*, of Kansas City, Missouri, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., CLINE and COBLE, JJ.

PER CURIAM:  A jury convicted Hammond of four counts of aggravated indecent liberties with a child between the ages of 14 and 15, under K.S.A. 21-5506(b)(1), and one count of indecent liberties with a child who was over 14 but under 16 years of age, under K.S.A. 21-5506(a). During trial, Hammond moved for a mistrial, claiming that the prosecutor committed error by unilaterally excusing a juror from the jury. The district court found no prejudice and denied Hammond's motion for mistrial. Before sentencing, Hammond moved for a dispositional departure to a term of probation or in the alternative, a motion for durational departure. The district court heard arguments before sentencing

1

and denied Hammond's request for dispositional departure but granted durational departure for the one count of indecent liberties with a child. Hammond also objected to the constitutionality of lifetime postrelease supervision as applied to him. The district court held a separate hearing on the objection and held that the application of lifetime postrelease supervision to Hammond was not unconstitutional. Hammond now appeals the district court's decisions on his motion for mistrial, his departure sentencing, and the imposition of lifetime postrelease supervision. Finding none of his arguments compelling, we affirm the district court's decisions for the reasons explained thoroughly below.

FACTUAL AND PROCEDURAL BACKGROUND

In 2020, the State charged Hammond with a total of eight child-sex offenses committed in 2018: five counts of aggravated indecent liberties with a child who was 14 or 15 years old, under K.S.A. 21-5506(b)(1); two counts of indecent liberties with a child who was 14 or more years of age but less than 16 years old, under K.S.A. 21-5506(a); and criminal sodomy of a child who was over 14 but under 16 years of age, under K.S.A. 21-5504(a)(3). All counts of the charging document stemmed from what Hammond alleged was a "consensual" relationship with a minor, who will be referenced throughout this opinion by the pseudonym of Jane.

*Family Background*

Jane testified to memories of visiting Hammond's home as early as when she was six years old. Jane's mother, Mary (minor victim's relatives also referenced by use of pseudonyms), worked for Hammond's father-in-law, the families attended church together, and Jane considered the Hammonds to be family friends. After Jane's parents divorced when she was 12 years old, Jane began spending a considerable amount of time with Hammond and his family. She babysat the Hammonds' children and worked at their construction company. For about a 3-year period when she was approximately 12 to 15

2

years old, Jane even lived in the Hammonds' home sporadically. Jane had the Hammonds' basement to herself, and Mary considered it a safe place for Jane to stay. Jane moved back to her mother's home when she was around 15 years old. By this time, the divorce was long settled, and Mary's boyfriend John had moved in with the family.

*A secret is revealed.*

In April 2020, Hammond took Sue—the daughter of Mary's boyfriend, John—and Jane fishing to a nearby lake. While the group traveled home, Hammond casually disclosed to Sue that he and Jane were having sex. Jane would later testify that she was not aware Hammond was going to disclose their relationship, and when Hammond dropped Sue and Jane off at Mary's house that night, Jane asked Hammond how old she was supposed to tell people she was when their relationship started. Hammond told Jane to say she was 16 years old.

The next day, Hammond and Jane revealed their relationship to Mary and John. Jane first talked to her mother alone and told her she needed birth control because she was having sex with Hammond. Hammond walked in later during the conversation and told Mary that Jane was 16 and that she needed to be on birth control. Mary was in shock, but Hammond laughingly told Mary that it was going to be okay. Jane believed that one day she and Hammond would get married and spend their life together.

For the next couple of days, Hammond repeatedly told Mary that Jane was 16— the age of consent—when the sex started, and that it was legal under Kansas law. Mary was still uncomfortable with the relationship, and a few days later, she told Jane that she could have no more contact with Hammond.

Although John and Mary decided Hammond and Jane could no longer contact each other in person, they agreed to allow Hammond to write Jane letters. Hammond sent

multiple letters to Jane and admitted in the first letter that he told his wife about their relationship and that he was in love with Jane. But in late April, Jane became upset when she learned from her mother and John that Hammond was still sleeping with his wife. In early May 2020, Hammond called Jane with a blocked number, and Jane responded angrily to his call given her knowledge about his relationship with his wife. Hammond tried to calm her down because he wanted to maintain their relationship.

Later, while the family was visiting Jane's brother in Oklahoma, Mary told him about Jane's relationship with Hammond. Jane's brother became angry and started questioning Jane about the relationship. Jane then broke down and told her family that she was just 14 years old when the sexual relationship began.

*Law enforcement involvement*

After the family returned from Oklahoma, Mary reached out to the Pawnee County Sheriff's Office. A lieutenant with the sheriff's office conducted the initial interview with Mary and John, but the sheriff decided to reach out to the Kansas Bureau of Investigation (KBI) for assistance based on the lieutenant's briefing. Senior Special Agent (SSA) Brian Carroll was assigned to the case.

Jane prepared an outline for her interview with SSA Carroll. Jane told SSA Carroll that Hammond first touched her breasts under her shirt in July 2018, after he purchased a puppy for her. Jane recalled the exact date from a photograph she took of herself with the puppy, on which she wrote a note on the back. Jane recalled specific sex acts 10 days after that date, including digital vaginal penetration in the basement of Hammond's residence, and a few weeks later, losing her virginity to Hammond in the basement of Hammond's company office. Jane said she had sex with Hammond again on the same day at his hunting cabin, and since then, she had sex with Hammond hundreds of times, at least three times a week. Jane specifically remembered having sex with Hammond on her

15th birthday after a golf tournament and before her school dance in December 2018. Jane's recollections were supported by photographs and notes she supplied to law enforcement, which were later used as evidence by the State during trial.

SSA Carroll asked Jane to initiate a recorded controlled phone call with Hammond. SSA Carroll coached Jane to tell Hammond that there was a criminal investigation and that her mother was going to make her talk to the KBI, possibly involving a lie detector test. Jane was told to say that she was worried that they were going to find out that they had sex when she was 14 years old.

During the phone call, Hammond did not deny having sex with Jane when she was 14 years old, but reassured Jane that they could not prove she had sex with him when she was 14 years old. Hammond told her that no one could prove it unless it "come[s] from [her] mouth" because the lie detector test cannot be used in court.

Law enforcement located no physical evidence of sex acts in Hammond's office basement, and there were no witnesses located who had knowledge of Hammond having a sexual relationship with Jane prior to her turning 16 years old.

*Hammond's trial*

The district court convened a jury trial on March 6, 2023. In the early morning on the fourth day of trial, before trial commenced for the day, the prosecutor notified the court that he had received a call from Police Chief Charles Orth that morning about an empaneled juror, Juror X. The chief told the prosecutor that Juror X's daughter had suffered a serious mental health episode overnight involving the use of a knife, during which the child had battered her parents, law enforcement had responded, and the situation evolved into an overnight event. The chief said that Juror X had been awake all night and remained with her daughter who was awaiting transport to a mental health

facility. Given this information, the prosecutor notified the court that he told the chief of police to let Juror X stay with her daughter and that he would inform the court of the situation.

The district court questioned the prosecutor on the record, asking, "[W]hat black letter law gives you the authority to discharge a juror?" The prosecutor acknowledged that he did not have authority to do so, apologized, and said, "[W]e can get her." The judge noted that the police should have called the court to deal with such a situation.

Given that defense counsel had just learned about the situation, they sought a short recess to confer with Hammond. Upon returning, defense counsel asked the court to declare a mistrial, arguing the prosecutor did not have the authority to unilaterally excuse or confer with the juror.

The prosecutor clarified that he did not have direct contact with Juror X and that his communication was solely with Chief Orth. He reiterated that all he said was to have the juror stay with her daughter and that Juror X had not been officially discharged. The prosecutor acknowledged the error in his judgment but contended that there was no ill intent. He argued if Juror X were present that morning in court, she would have been released as an alternate due to the circumstances and there were still alternate jurors available. The State asked the court to deny the request for a mistrial.

The district court acknowledged the issue was not the difficulty suffered by Juror X, but the process—that is, the unauthorized unilateral decision by the prosecutor, since Hammond did not have an opportunity to join in the discussion with the police chief when it occurred. Ultimately though, because Hammond's counsel requested a mistrial, the district court asked how the defense believed it was prejudiced.

6

Defense counsel argued that there was no way to rehabilitate the situation because Juror X was told she did not have to be in court, so to bring her back would cause her to carry animosity toward Hammond and his attorneys for forcing her to come in despite the prosecutor telling her she was not required to be there. Defense counsel claimed that although there were alternate jurors, the alternates were to be chosen at random.

Weighing all arguments, the district court ultimately held that based on the facts presented, it would have released Juror X from the jury due to the issues going on in her life, and therefore, it found no prejudice despite the procedure undertaken by the State. The district court offered to have the police chief testify on the record but found that prejudice did not attach because the conclusion of the court would not have changed. Acknowledging that the procedure was problematic, the judge overruled Hammond's motion for mistrial and proceeded with the hearing.

Defense counsel agreed that bringing the police chief to testify to make a record would be the best course of action. During his testimony, Chief Orth confirmed the situation with Juror X's daughter, as explained by the prosecutor, and testified that he contacted the prosecutor about the circumstances. Chief Orth testified that he was told about the situation at 6:30 a.m. that morning, and he called the prosecutor at about 7 a.m. to ask the prosecutor if it would be possible to have Juror X excused from the jury due to her emotional state and the extenuating circumstances. The prosecutor told Chief Orth to allow Juror X to remain with her daughter and he would contact the court. The police chief denied that the prosecutor said Juror X was excused at the time. When asked about the father of Juror X's daughter, Chief Orth testified that the father was unavailable because he was in the National Guard full-time and was stationed out of town.

Based on the police chief's testimony, the judge reaffirmed that in the given situation, the court would have discharged Juror X from further service on the jury. The district court entered an order formally excusing Juror X from the jury and reiterated its

prior decision denying the motion for mistrial, while defense counsel renewed his objections for the reasons previously stated.

*The conviction and sentencing*

The jury found Hammond guilty of Counts 2-5, four counts of aggravated indecent liberties with a child, and Count 6, indecent liberties with a child. Hammond moved for a dispositional departure sentence, arguing for a term of probation, or in the alternative, for a durational departure. After considering all mitigating factors alleged by Hammond, the district court found no exception for departure and denied Hammond's motion.

Hammond also filed a motion for new trial, which the district court addressed at the sentencing hearing. One of the issues addressed in that motion was the claim of prejudice resulting from the allegation that the prosecution unilaterally dismissed Juror X. In reconsidering and then denying the defense motion, the district judge stated:

> "I think all would agree that the court has the right to discharge a juror in its discretion. The question arises in that the juror was excused, at least in informally, without any input from the court. Later hearings resulted that morning, including a sworn testimony by Chief of Police, Charles Orth. From that, the court made the decision, and issued a formal order as a matter of law, that the juror was discharged, noting that circumstances had already occurred that the court had no control over. But ultimately, it presented with the same factual circumstances as Chief Orth testified too, the court would have exercised its discretion and discharged that juror.
> "So, the question becomes whether Mr. Hammond shows prejudice in either, substantial prejudice from abuse of discretion, by the court's order discharging the juror, or from the events that occurred prior to the court issuing its formal order. An argument was raised on behalf of Mr. Hammond, that had the court spoken with the juror, the court might've been able to repair the situation. The juror might've agreed to continue, and that this particular juror, could've been a juror that would have viewed the evidence and

maintained a favorable aspect towards Mr. Hammond. All of that is true, as is the converse. Because there's no way to know what that impaneled juror might have done.

"In addition, because of the length of the trial, the court impaneled 14 individuals. We had 2 anonymous alternates. There's no way to know if this—(inaudible)—juror, might have been an alternate or not. And actually, there's a 1 in 7 chance, that that juror would've been. So, there's all sorts of unknowns that factor into whether or not prejudice occurred through the discharge of that juror. I think it boils down to the fact that through the cooperation of counsel, the court made sure that the remaining jurors were fully insulated. They had no information of what have occurred that morning, other than, they were told that a juror had been excused by the court.

"The excusal of that juror had no bearing upon the manner of presentation of evidence, or the evidence that was presented. None of those impaneled jurors knew whether or not they were an alternate. They didn't know if the excused juror would've been an alternate because all that as they were told, was going to be determined at the close of trial.

"The court would find that it would renew its finding as to the Motion for Mistrial, in that the court did find any substantial prejudice as a matter of law, occurring to Mr. Hammond, through the excusal of the juror. Secondly, the court would find that there's been no showing of a reasonable probability the result of the trial would've been different, had that juror not been excused by the prosecution."

After denying the motion for new trial, the district court imposed a presumptive sentence of 59 months of imprisonment on Counts 2, 4, and 5, and 32 months on Count 6, to run concurrent to the base offense. The district court granted a durational departure for Count 3 and imposed 37 months in prison to be served consecutive to the base offense. Hammond was also ordered to serve lifetime postrelease supervision.

Hammond objected to the constitutionality of the lifetime postrelease supervision, and the district court allowed briefing on the matter. The district court held a separate hearing on the objection. After receiving arguments from both sides, the district court denied Hammond's motion of objection, declining "to find that the imposition of lifetime postrelease as it applies to the defendant is so disproportionate to the crime for which it is

9

inflicted that it shocks the conscience and offends fundamental notions of human dignity."

Hammond timely appeals.

## THE DISTRICT COURT DID NOT ERR BY DENYING HAMMOND'S MOTION FOR MISTRIAL

In his first issue on appeal, Hammond argues the district court erred in refusing to declare a mistrial by improperly placing on him the burden to show how the prosecutor's conduct was prejudicial, rather than on the State. He contends that the district court should have found the prosecutor's unilateral conduct so egregious that it amounted to structural error, which in turn violated his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution—that is, his rights to a fair trial, a jury of his peers, and to due process. In the alternative, if this court finds the error was not structural, he asserts this court should consider it under a prosecutorial error standard and find the prosecutor's ex parte communication with the juror was not harmless and the district court should have found the prosecutorial error deprived him of a fair trial.

*Which legal standard is applicable?*

The parties disagree as to which standard of review must apply on appeal. To the extent we determine which legal standard to apply, this is a question of law over which we have unlimited review. See *State v. McDaniel*, 306 Kan. 595, 600, 395 P.3d 429 (2017). The State argues this is simply an appeal of the district court's denial of Hammond's request for a mistrial and argues the Kansas mistrial statute, K.S.A. 22-3423(1)(c), and its related standard of review—an abuse of discretion—should apply. *State v. Bartlett*, 308 Kan. 78, 88, 418 P.3d 1253 (2018) ("Appellate courts review a district court's ruling on a motion for mistrial for an abuse of discretion."). The State relatedly argues that any other argument by Hammond is unpreserved, as the only

10

argument presented before the district court was one regarding the motions for mistrial and new trial.

Although Hammond argued for a mistrial under K.S.A. 22-3423(1)(c) before the district court, he does not significantly focus on the mistrial statute on appeal. Instead, he urges us to consider the district court's decision under a de novo standard of review, because he suggests the prosecutor's unilateral dismissal of Juror X constituted a structural error, which "interferes with the court's basic function and denies a defendant the basic protections afforded during criminal trial. Structural errors are so pervasive they defy analysis by harmless-error standards and require automatic reversal." *State v. Johnson*, 310 Kan. 909, Syl. ¶ 1, 453 P.3d 281 (2019).

In the event we disagree with his submission of structural error, Hammond alternatively proposes we consider the issue under the same standard of review we use when reviewing claims of prosecutorial error. Citing the two-part test under *State v. Sherman*, Hammond argues the prosecutor's dismissal of Juror X fell well outside the latitude afforded the State, and the district court never required the State to demonstrate beyond a reasonable doubt that the prosecution's error did not affect the outcome of the trial. 305 Kan. 88, 108-09, 378 P.3d 1060 (2016).

Although the State contends we should outright dismiss these structural error and prosecutorial error arguments for lack of preservation alone, we find it unnecessary to spend considerable time parsing whether he actually preserved the specific arguments he now presents in his brief, because we ultimately find this appeal is of the denial of a motion for mistrial, and nothing more.

1. *Structural error is not the applicable standard.*

Hammond admits he found no other case in Kansas, or elsewhere, during which a prosecutor unilaterally dismissed a juror, so for this reason, he suggests the error is "beyond the pale" and should be considered a structural error. But he does cite other Kansas cases where attorneys have initiated or participated in ex parte communications with jurors. For example, he cites *State v. Jakobosky*, where the prosecutor made statements to jurors before the jury was impaneled and while the court was in recess, but the court denied the defendant's motion for mistrial. *State v. Jakobosky*, No. 92,259, 2005 WL 517297, at *2-3 (Kan. App. 2005) (unpublished opinion). This was reviewed, though, using the standard for denial of a motion for mistrial. He also compares Hammond's lack of presence for the early morning phone call to the situation in *State v. McGinnes*, where the judge had improper ex parte communications with the jury. 266 Kan. 121, 124-25, 967 P.2d 763 (1998). But there, our Supreme Court emphasized the denial of a defendant's constitutional right to be present at all critical stages of his trial is subject to harmless error analysis. 266 Kan. at 127-28; see also *State v. Mann*, 274 Kan. 670, 683, 56 P.3d 212 (2002) (denial of right to be present at trial during ex parte communications between judge and jurors subject to harmless error review).

In none of the situations referenced by Hammond did the courts utilize the structural error standard. And finding no similar precedent, we also note that this situation does not fall into one of the limited class of errors that either the United States Supreme Court or Kansas Supreme Court have, to date, designated as structural error. See *State v. Johnson*, 310 Kan. 909, 914, 453 P.3d 281 (2019) (listing the following:  "(1) total deprivation of counsel; (2) lack of an impartial trial judge; (3) denial of the right to self-representation at trial; (4) violation of the right to a public trial; (5) erroneous reasonable-doubt instruction; and (6) unlawful exclusion of members of the defendant's race from a grand jury [Citations omitted.]"); see also *State v. Cantu*, 318 Kan. 759, 773-74, 547 P.3d 477 (2024) (The denial of a defendant's constitutional right to testify by

improperly removing the defendant from the stand and striking the defendant's entire testimony was structural error under the circumstances of this case, but the "extent and circumstances of the deprivation drive the reversibility framework.").

Finding no precedent through which we would apply the structural error standard to the district court's denial of Hammond's request for mistrial, we decline to do so. See *State v. Sherman*, 305 Kan. at 107-08 (discussing the doctrine of stare decisis and the importance of the same and lower courts following points of law established by a court).

2. *Prosecutorial error is not the applicable standard.*

We find the application of the prosecutorial error standard likewise inappropriate. As mentioned above, we find it unnecessary to dwell on the State's preservation arguments. But whether Hammond made these arguments to the district court is worth consideration as to Hammond's suggestion that we apply the prosecutorial error standard, albeit for a different reason. Often, the appellate courts address a claim of prosecutorial error for the first time on appeal. See *State v. George*, 311 Kan. 693, 703, 466 P.3d 469 (2020) ("[We] review a prosecutor's comments to a jury during voir dire, opening statement, or closing argument which are not evidence [for] prosecutorial [error] even when no objection was lodged at the trial level, although the presence or absence of an objection may figure into our analysis of the alleged [error]."). And here, we find this of some significance to our decision of which standard of error to apply.

In a claim of prosecutorial error, frequently it is the appellate court that is first faced with an appellant's claim that a prosecutor stumbled by making an errant comment in front of the jury, and that claim is one that was never presented to the district court at trial. So, then, the appellate court is left to decide whether the prosecutor erred, and whether any error prejudiced the defendant's right to a fair trial. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021). In doing so, the appellate court examines, on a cold

record, well after the trial is concluded, whether the State has shown "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" 313 Kan. at 406 (quoting *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 [2020]). In such an instance, the district court was not provided an opportunity to assess the allegedly erroneous conduct that the defendant claims the prosecutor committed.

But the standard for evaluating the denial of a motion for mistrial is different, and for good reason, one that is well-illustrated here. In this instance, the prosecutor's misstep was widely acknowledged at trial. No party disagreed that the prosecutor made an error of judgment. The prosecutor admitted as much, took responsibility for his unadvised actions, and apologized on the record. There is hardly any question of whether there was a misstep on the part of the State.

So here, the conduct unfolded before the district judge, which clearly distinguishes this issue from a prosecutorial error situation. Here, the prosecution brought the issue to the district court's attention. Defense counsel was provided the opportunity to confer with his client, question the necessary witness (Chief Orth), and then argue not just his oral motion for mistrial, but he also then presented a written motion for new trial before sentencing. Unlike what more often occurs when a prosecutorial error is presented to an appellate court on appeal, this issue has been fully considered—not just once, but twice— by the district court, which supports the appellate court's consideration of the issue under a more limited standard of review.

   3. *The applicable standard is the standard for the denial of a motion for mistrial.*

Hammond is ultimately arguing that he should be granted a new trial because the district court's refusal to grant a mistrial was based on incorrect legal standards. In the interest of clarity, we note that Hammond primarily presents his argument as to the

14

district court's denial of his oral motion for mistrial, but he also presented a motion for new trial to the district court which included, in part, some of the same arguments. On appeal, his mentions of his motion for new trial are discussed primarily in the context of preservation, however. We review the district court's decisions on both types of motions under an abuse of discretion standard, and both inquiries—whether in the mistrial or new trial context—examine whether the State's conduct deprived Hammond of a fair trial. See *State v. Longoria*, 301 Kan. 489, 529-30, 343 P.3d 1128 (2015) (examining the standards applied to both the mistrial and new trial contexts).

Recognizing the similarities in the standards for both motions, we examine Hammond's appeal as presented—that is, the denial of his motion for mistrial. Appellate courts review a district court's grant or denial of a mistrial under K.S.A. 22-3423 for abuse of discretion, and this is the standard we now apply. *State v. Bartlett*, 308 Kan. at 88. A district court abuses its discretion when its decision

> "(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 570, 256 P.3d 801 (2011).

Hammond argues the prosecutor's conduct prejudiced him and deprived him of a fair trial. K.S.A. 22-3423(1)(c) outlines that the trial court may end the trial "and order a mistrial at any time the court finds termination necessary because '[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution.'" *State v. Fraire*, 312 Kan. 786, 790, 481 P.3d 129 (2021). When deciding a motion for mistrial under this statute, the district court uses a two-step process. First, the court determines whether the prejudicial conduct caused a fundamental failure in the proceeding. If so, the court then decides whether "the

15

prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial." 312 Kan. at 790. As part of this second step of its inquiry, where the fundamental failure in the proceeding infringes on a right guaranteed by the United States Constitution, the trial court should apply the constitutional harmless error analysis. *Ward*, 292 Kan. at 569 (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]). But even if the error is constitutional, the district court examines whether the conduct caused prejudice that could not be cured or mitigated through jury admonition, jury instruction, or other curative action. *Ward*, 292 Kan. at 569-70.

When addressing whether the prosecutor's conduct had caused a fundamental failure in the proceeding, the district court acknowledged the difficulties Juror X encountered. The juror's daughter battered her parents, damaged property, and used a knife to threaten suicide. The incident required law enforcement response, lasted throughout the night, and Juror X was still "one-on-one" with her daughter awaiting the child's transfer to a mental health facility, due to her husband's absence for military duty, when Chief Orth contacted the prosecutor to ask whether Juror X might be excused. The district court recognized the trauma which had occurred in Juror X's home, and the issues the juror was still required to address, and found that had it been presented with those circumstances "in regular fashion," the court would have discharged Juror X from service.

Although the district court recognized that the prosecutor erred by unilaterally allowing Juror X to stay home without authority to do so or permitting the defense to participate in the conversation, it found no fundamental failure in the proceeding, because it would have discharged Juror X from service itself. The district court then properly focused on the second step of its necessary inquiry, which is: Did the prosecutor's conduct cause uncurable prejudice?

16

Hammond argues that he should not have been required to demonstrate prejudice, as the "innocent party," and that such a burden should have been borne by the State. It is true that, in most cases where we apply a constitutional harmless error standard, we impose the burden of production on the State as the party benefitting from the alleged error. *Ward*, 292 Kan. at 568-69; see *Longoria*, 301 Kan. at 530 (determining whether the State can show beyond a reasonable doubt that the prosecutor's error did not affect the trial's outcome).

While there is no doubt the State caused the error here, it is difficult to perceive how the State *benefitted* from it, such that the district court's question to defense counsel—"The question comes down, with any request for mistrial, though, is: Mr. McConnell, what's the prejudice"—would equate to an error of law that forms the basis of an abuse of discretion. The district court's actions do not appear objectively unreasonable. After asking the question, the district court then itself suggested and allowed defense counsel to question Chief Orth on the record to ensure that the facts presented by the prosecution were, in fact, correct, before again considering Hammond's motion for mistrial. Being satisfied with the chief's sworn testimony, the district court reiterated that, had it been presented with Juror X's situation "in regular fashion," it would have discharged her from further jury service, and denied Hammond's motion for mistrial.

The district court then again examined the issue of prejudice, essentially for a third time, in its denial of Hammond's motion for new trial prior to sentencing. During that discussion, the court acknowledged Hammond's argument that conceivably Juror X may have been a juror who viewed the evidence in Hammond's favor and perhaps assisted in a more favorable outcome for him. But the converse may have also been true, and no evidence demonstrated how the dismissal of Juror X substantially prejudiced Hammond's trial. The court noted that because there were two anonymous alternates—14 jurors selected in total at the beginning of trial—there was no way to know whether Juror X

17

would have been an alternate when deliberations were to begin with the final 12 jurors. Regardless, the district court found that "it boils down to the fact that through the cooperation of counsel, the court made sure that the remaining jurors were fully insulated. They had no information of what ha[d] occurred that morning, other than, they were told that a juror had been excused by the court." None of the jurors knew whether they might be an alternate, or whether the excused juror was an alternate.

The district court found the excusal of Juror X had no "bearing upon the manner of presentation of evidence, or the evidence that was presented." Because of this, the court found there was no substantial prejudice to Hammond by the excusal of Juror X, and no reasonable probability that the result of the trial would have been different had Juror X not been excused by the State.

Although Hammond suggests the prosecutor's error here was "beyond the pale" and should simply have been considered a structural error, our Supreme Court has repeatedly found that in-court errors involving the jury could amount to harmless error. See *State v. Mann*, 274 Kan. 670, 683, 56 P.3d 212 (2002) (ex parte communication with jurors resulted in harmless error); *State v. Lopez*, 271 Kan. 119, 131-32, 134, 22 P.3d 1040 (2001) (in-chambers conference with trial judge and counsel questioning venireperson without defendant's presence resulted in harmless error); *State v. Minski*, 252 Kan. 806, 816, 850 P.2d 809 (1993) (ex parte communication between trial court and juror who suffered medical emergency was harmless error); *State v. Folkerts*, 229 Kan. 608, 616, 629 P.2d 173 (1981) (trial court's ex parte communication excusing a juror for personal reasons and substituting an alternate in her place did not amount to error). The prosecutor's ex parte comment permitting Juror X to remain at home pending further decision by the court—a communication that was not initiated by the State but by the police chief—in combination with the thorough review of the prosecutor's conduct and the prejudice caused by the conduct and the removal of the juror by the district court, does not stray far from our Supreme Court's evaluation in these cases. And our court has

18

previously determined that a prosecutor's improper ex parte communications with jurors prior to the trial and during a recess, while erroneous, did not amount to substantial prejudice, and found no abuse of discretion in the district court's denial of the motion for mistrial. *Jakobosky*, 2005 WL 517297, at *3.

Although Hammond does not attack the substantial competent evidence underlying the district court's exercise of discretion, we point out some important details. First, Chief Orth contacted the prosecutor at approximately 7 a.m., based on the chief's testimony. The transcript of that day's trial reveals the hearing on the issue commenced at 9 a.m.—just two hours later, and the prosecutor had apparently previously announced the situation in the clerk's office off-record. At no point does it appear the prosecutor attempted to conceal Juror X's situation or his communication with the police chief, but he seemed to be affirmatively working to bring it to the court's attention.

We do not condone the knee-jerk response of the prosecutor and acknowledge that the better practice would have been if the prosecutor had directed the police chief during the phone call to hang up and call the district court, and then the prosecutor immediately contacted opposing counsel to inform them of the situation. But while these are best practices, they are also suggestions which are more easily offered in hindsight. Given the narrow timeline in which the situation unfolded, despite the prosecutor's actions, we cannot say the district court's decision was not supported by evidence or the law, or that no reasonable person would have made the same decision as the district court in this situation. We find no abuse of discretion in the denial of Hammond's motion for mistrial.

### THE DISTRICT COURT DID NOT ERR IN SENTENCING HAMMOND

Hammond next argues that the district court abused its discretion by denying his motion for dispositional departure to probation. He claims the district court failed to

19

properly consider all the mitigating factors he asserted in his motion for departure sentencing.

*Applicable legal standards*

A district court's decision to deny a departure sentence is reviewed for abuse of discretion. *State v. Fowler*, 315 Kan. 335, Syl. ¶ 1, 508 P.3d 347 (2022). Hammond, as the party asserting that the district court abused its discretion, bears the burden of showing such abuse. *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021).

A district judge must impose the presumptive sentence in the applicable sentencing guidelines grid block "unless the judge finds substantial and compelling reasons to impose a departure sentence. If the sentencing judge departs from the presumptive sentence, the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure." K.S.A. 21-6815(a). For purposes of granting a departure, the term "'substantial'" means "'real, not imagined, and of substance, not ephemeral.'" *State v. Morley*, 312 Kan. 702, 713, 479 P.3d 928 (2021). "A compelling reason is one that *forces* a court—by the case's facts—to abandon the status quo and venture beyond the presumptive sentence." 312 Kan. at 714.

K.S.A. 21-6815(c)(1) contains a nonexclusive list of mitigating factors a sentencing court may consider in determining whether substantial and compelling reasons for a departure exist but are not limited to these factors. In any event, the existence of mitigating factors, however many, does not necessarily compel a sentencing court to depart from a presumptive sentence. *Fowler*, 315 Kan. 335, Syl. ¶ 2, 339-40 (collecting cases).

When a sentencing court grants a departure based on a nonstatutory factor, appellate courts first determine whether that factor can be a mitigating factor as a matter

of law under K.S.A. 21-6815(c). Because this first step involves a legal question, our review is unlimited. Second, appellate courts decide whether substantial competent evidence supports the nonstatutory factor's existence, i.e., for an error of fact. Finally, appellate courts determine whether the sentencing court acted reasonably when it concluded there was a substantial and compelling reason to depart based on that nonstatutory factor by itself or collectively with other statutory or nonstatutory factors cited by the sentencing court. The second and third inquiries are reviewed for an abuse of discretion. *Fowler*, 315 Kan. at 336-37.

*This court lacks jurisdiction to review presumptive sentences.*

Preliminarily, we first address a threshold issue the parties failed to raise. Under the revised Kansas Sentencing Guidelines Act (KSGA), appellate courts lack jurisdiction to consider challenges to the district court's denial of a departure motion from a presumptive sentence. *State v. Farmer*, 312 Kan. 761, 764, 480 P.3d 155 (2021). K.S.A. 21-6820(c)(1) prohibits appellate review of "'[a]ny sentence that is within the presumptive sentence for the crime,'" including the denial of a motion for dispositional departure. *Farmer*, 312 Kan. at 764. The KSGA defines presumptive sentence as a sentence within the range set forth in the sentencing grid block, factoring in both the severity level for the crime of conviction and the defendant's criminal history score. K.S.A. 21-6803(q).

Neither party disputes that Hammond's sentences for his convictions on Counts 2, 4, 5, and 6 fell within the presumptive guideline sentences under KSGA. So, we lack appellate jurisdiction to review Hammond's sentences on those counts.

But Hammond's sentence on Count 3 was not a presumptive sentence. The district court granted Hammond a durational disposition and sentenced him to 37 months in prison, which is well below the presumptive range. Because departure sentences are

21

subject to appeal by the defendant, we maintain jurisdiction to review Hammond's sentence on Count 3 only.

*The district court did not abuse its discretion by denying Hammond's departure motion.*

Before we analyze the merits of Hammond's argument, we note that the State argued in passing that Hammond's motion was granted because his motion was for a dispositional departure or, in the alternative, for a downward durational departure, which he received. So, the State urges us to dismiss Hammond's appeal on the bases that he has no adverse ruling left to appeal and he has not preserved his argument for appeal. We find the State's arguments uncompelling.

Our Supreme Court in *State v. Looney*, 299 Kan. 903, 909, 327 P.3d 425 (2014), held that all departure sentences are subject to appeal under K.S.A. 21-4721(a)—now codified as K.S.A. 21-6820—unless appellate jurisdiction is divested by a more specified provision, such as K.S.A. 21-6820(c). This is true even if the defendant was granted a downward durational departure but denied a dispositional departure. See *State v. Ibarra*, 307 Kan. 431, 433, 411 P.3d 318 (2018). Moreover, the State fails to fully support its preservation challenge and has effectively abandoned this argument on appeal. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020) (A point raised incidentally in a brief and not argued therein is deemed waived or abandoned.).

Hammond lists a number of mitigating factors that the district court should have considered when examining his departure motion. He asked the district court to grant a dispositional departure to 36 months of probation following a 60-day jail sanction. He asserts:

> "(1) [Jane] actively participated in the relationship; (2) The degree of harm to [Jane] was significantly less than typical for such an offense; (3) Hammond's business would be

22

significantly impacted by an extended absence, in turn substantially affecting many other families in the community; (4) Hammond's family would be negatively impacted by his absence; (5) Hammond has no criminal history, is unlikely to reoffend, and is [amenable] to rehabilitation; and[] (6) Hammond poses no danger to the community."

He complains the district court did not sufficiently provide its reasoning for rejecting these mitigating factors when denying his motion for departure.

For his first two factors, Hammond claims that Jane was a willing participant in their consensual relationship—even expecting to marry Hammond eventually—and emphasized that she did not suffer any physical harm. Hammond argues her consent is a substantial and compelling mitigating factor under K.S.A. 21-6815(c)(1)(A), which states if a "victim was an aggressor or participant in the criminal conduct associated with the crime," it may be considered as a mitigating factor. In support, he relies on an unpublished decision, *State v. Liskey*, where our court affirmed the district court's departure sentence because the appellant suffered from mental impairment, which prevented him from having substantial capacity to make judgments. No. 103,145, 2010 WL 4977156, at *3-4 (Kan. App. 2010) (unpublished opinion). In *Liskey*, our court also found that the minor was a participant in the relationship because he initiated the relationship leading to sexual activities, gave Liskey a ring, and considered themselves husband and wife. The minor also actively pursued Liskey when she moved out-of-state to end the relationship.

Hammond's argument is unpersuasive. First, *Liskey* is clearly distinguishable. Hammond did not present any medical professional's opinion stating that he suffers from a mental impairment affecting his capacity to make judgments. Further, although the relationship with Jane may have been consensual, the record lacks any evidence that Jane made the initial advances or actively pursued Hammond. She may have at one point been in the relationship with Hammond willingly, but her participation does not reach the

distinction shown in *Liskey*. And, since the decision in *Liskey*, our Supreme Court has reiterated that minors are considered legally incapable of consenting to sexual conduct, and we find this argument does not weigh in Hammond's favor. *State v. Funk*, 301 Kan. 925, 939-40, 349 P.3d 1230 (2015).

Moreover, aside from simply stating she suffered no physical harm, Hammond neglects to elaborate on how the harm on Jane was "significantly less than typical for such an offense" as articulated under K.S.A. 21-6815(c)(1)(E). He only asserts that Jane suffered no physical harm, and this alone should be considered a mitigating factor. But the district court specifically found that although Jane did not exhibit any physical harm, she attested to suffering from psychological or mental health issues. Jane's victim statement disclosed that she frequently considered death when Hammond abused her. Jane also testified that she still suffers from anxiety and depression, eating disorders, trust issues, and dreams about being unsafe because of the trauma. Considering Jane's testimony, Hammond fails to adequately support his argument or justify how the harm she suffered was significantly less than typical. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (An issue not briefed is deemed waived or abandoned.).

Next, Hammond argues the court should have considered as non-statutory mitigating factors the impacts of his incarceration on his business and family. He claimed his construction business, which he started with his wife, would be negatively impacted by his absence and this would also affect the lives of his employees and subcontractors in the community. Although his employment status alone may not furnish a substantial and compelling basis for departure, Hammond argues it should have been considered as part of a totality of circumstances analysis. He also concedes that his responsibilities to his family are likewise not sufficiently substantial and compelling factors for departure, but when considered with other mitigating factors, they may support departure.

24

Finally, as final non-statutory mitigating factors, Hammond asserts his lack of criminal history and that he poses no threat to the community should have been considered by the district court. Again, he acknowledges that neither of the facts alone are enough to warrant a departure but argues that the district court should have properly considered them as mitigating factors. Hammond emphasized that he had the lowest criminal history score and did not violate any bonds during the three years he awaited trial. He also claims that he poses no danger to the community because he had no history of violence and had abided by the no-contact order since being criminally charged. He believes these facts demonstrate that he was an excellent candidate for probation.

As Hammond claims, it is true the district court did not elaborate on every mitigating factor he presented through his motion for departure sentencing. But the record reflects that the district court weighed the factors and arguments contained in Hammond's written motion and oral argument at sentencing, as well as the extensive testimonials from family, friends, coworkers, employees, and individuals in the community who supported Hammond. The court recognized his contributions to the community and credited his efforts to rebuild and repair the relationships in his life since being charged and convicted in this case. Despite these positive aspects, the court determined the mitigating factors Hammond presented were not substantial and compelling, focused on the impact of the crimes on the victim's life, and denied Hammond's motion for dispositional departure. The court did, however, grant Hammond a durational departure sentence on Count 3.

This grant of a durational departure substantiates the court's consideration of the mitigating factors Hammond presented during sentencing—had it not considered the mitigating circumstances he presented, the court would not have permitted a durational departure. Again, the mere presence of mitigating factors does not require a sentencing court to grant a departure or impose a lesser sentence. *Fowler,* 315 Kan. at 339. And while the district court did not expound on all the mitigating factors claimed by

Hammond, the court is not required to do so when denying a departure motion. *State v. Florentin*, 297 Kan. 594, 601-02, 303 P.3d 263 (2013); see K.S.A. 21-6820(d).

Hammond does not distinguish between the statutory and non-statutory mitigating factors or claim the sentencing court's decision was based on an error of law or fact. As such, we need only consider whether the district court's decision was reasonable. See *Fowler*, 315 Kan. at 336-37. On review of the entire record, we find a reasonable judge could have reached the same conclusion, and Hammond fails to meet his burden to show the district court abused its discretion by denying Hammond's motion for departure to probation.

THE DISTRICT COURT DID NOT ERR BY IMPOSING LIFETIME POSTRELEASE SUPERVISION

In his final argument, Hammond contends that the district court erred by imposing lifetime postrelease supervision. He claims that, as applied to him, this sentence was unconstitutional. He invokes both the Eighth Amendment to the United States Constitution and section 9 of the Kansas Constitution Bill of Rights, which prohibit cruel and unusual punishment.

*Applicable Legal Standards*

Appellate courts apply a bifurcated standard of review when assessing whether a sentence is cruel or unusual in violation of section 9 of the Kansas Constitution Bill of Rights. See *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012) (citing *State v. Ortega-Cadelan*, 287 Kan. 157, 160, 194 P.3d 1195 [2008]). This court reviews the district court's factual findings for substantial competent evidence without reweighing the evidence. The legal conclusions drawn from the factual findings are considered de novo. *Mossman*, 294 Kan. at 906 (citing *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 [2009]; *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 [2007]).

26

The United States Supreme Court and the Kansas Supreme Court have both recognized that a punishment violates the constitutional safeguards prohibiting cruel and unusual punishment when a sentence is grossly disproportionate to the crime. *Solem v. Helm*, 463 U.S. 277, 288-89, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983); *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). To determine whether a sentence's length is unconstitutionally disproportionate to the crime for which that sentence is imposed, Kansas courts consider three factors commonly known as the *Freeman* factors:

> "'(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;
>
> "'(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and
>
> "'(3) A comparison of the penalty with punishments in other jurisdictions for the same offense.'" *Mossman*, 294 Kan. at 908 (quoting *Freeman*, 223 Kan. at 367).

No one *Freeman* factor is individually controlling, but the district court must address all three factors in its analysis. *State v. Riffe*, 308 Kan. 103, 109, 418 P.3d 1278 (2018).

Generally, an appellate court presumes the district court made the necessary findings to support its conclusion when a party did not object to insufficient findings. See *State v. Longoria*, 301 Kan. at 506. But when the record on appeal does not support this presumption, the appellate court must remand for additional factual findings and legal conclusions. *Riffe*, 308 Kan. at 111.

*Lifetime postrelease supervision is not unconstitutional as applied to Hammond.*

Under K.S.A. 2018 Supp. 22-3717(d)(1)(G)(i), a person sentenced to imprisonment for a sexually violent crime who is over the age of 18 shall be placed on a mandatory lifetime postrelease supervision. As defined in K.S.A. 2018 Supp. 22-3717(d)(5)(C), "'sexually violent crime'" includes aggravated indecent liberties with a child under K.S.A. 21-5506(b), of which Hammond was convicted. Our Supreme Court has found that mandatory lifetime postrelease supervision is not categorically unconstitutional. *State v. Cameron*, 294 Kan. 884, 895-98, 281 P.3d 143 (2012). Hammond fails to acknowledge this fact on appeal but challenges the lifetime period as unconstitutional when applied to his case.

Before the district court pronounced Hammond's sentence, he objected to the lifetime postrelease supervision and requested a *Freeman* factor hearing. The district court gave the parties a chance to brief their positions on the constitutionality of lifetime postrelease supervision. During the hearing, the district court discussed in detail its findings for each *Freeman* factor based on the facts and circumstances of Hammond's case and ultimately overruled Hammond's objection. The district court's findings and decision were encapsulated in a journal entry. Each factor addressed by the district court is examined here.

1. *The first* Freeman *factor*

Hammond argues that the district court's legal conclusion about the first *Freeman* factor was not supported by the record. He contends both the nature of the offense and his own character support the conclusion that he poses no danger to society. Hammond emphasizes that his relationship with Jane was consensual, and the record lacks any evidence showing the relationship was coerced. He also reasserts the testimonials of his family and other community members to show that he is neither violent nor predisposed

28

to commit sexual offenses. Hammond claims that the district court's reasoning placed too much weight on the penological purpose of the sentence and disregarded the other facts.

But the record contradicts Hammond's arguments, and we discern no error in the district court's factual findings nor its conclusion that the first *Freeman* factor weighs against Hammond. In its ruling, the district court found these facts favorable to Hammond:

- Hammond has no prior criminal history and his performance on bond was exemplary with no violations.
- The testimonials and documents submitted by Hammond demonstrated that he had significant support from his family and the community.
- Hammond had no predisposition to commit any other sex crime before his conviction.

Although the court found those factors to be mitigating, the court found other facts which weighed on the "other side of the ledger":

- The five convictions are sexually violent crimes, and although no physical force or harm was evident, there was significant evidence of psychological or emotional trauma of the victim.
- Hammond was in a position of trust—a father figure during the divorce of Jane's parents—and he took advantage of Jane's vulnerable state, if not just by age but certainly by virtue of the circumstances occurring in her life.
- Despite the argument that Jane actively participated in the relationship, she possessed no legal ability to consent. Moreover, the

29

evidence displayed a pattern of Hammond inducing Jane into gradually progressive sexual activities which occurred over a substantial period, and were not limited to an isolated event.

- The imposition of postrelease supervision serves a penological purpose, ensuring public safety while also acting as a deterrent to future criminal conduct and provides immediate intervention if Hammond's conduct were to require as much.

After articulating these facts, the district court found that the factual circumstances of this case, collectively, do not support the first factor under the *Freeman* analysis. As demonstrated by the record, the district court considered and articulated all the factors that Hammond now argues the district court overlooked.

Moreover, as discussed above, arguments like Hammond's—that a minor consented or initiated sexual contact—have been found unpersuasive by our Supreme Court because the minor victims of those crimes are legally incapable of consenting to such acts. *Funk*, 301 Kan. at 939-40; see also *Mossman*, 294 Kan. at 910 (defendant alleged sex acts with 15-year-old victim were consensual).

Finally, Hammond's contention that the district court improperly weighed the penological purpose more heavily lacks support in the record. As shown by the number of factors the district court examined, this was but one item the court considered. And, our Supreme Court has repeatedly stressed the importance of the penological purpose of lifetime postrelease supervision for sex offenders because its purpose is not only to punish but includes rehabilitation and incapacitation. *Mossman*, 294 Kan. 901, Syl. ¶ 5. This is especially critical in these cases due to the high recidivism rate shown in sex offenders. *State v. Dull*, 302 Kan. 32, 57, 351 P.3d 641 (2015). Thus, according to our Supreme Court, the design for lifetime postrelease supervision serves mainly to "'to act as

30

a deterrent to future crime, a goal that is particularly legitimate given sex offenders' higher rate of recidivism.'" *Funk*, 301 Kan. at 939.

Hammond does not challenge the sufficiency of the district court's factual findings, so we presume the district court made the necessary findings to support its conclusions. *Longoria*, 301 Kan. at 506. As to our review of the court's legal conclusion that the first *Freeman* factor weighed against Hammond, we must agree.

### 2. *The second* Freeman *factor*

Next, this court must compare Hammond's lifetime postrelease supervision term to other punishments in this jurisdiction for more serious offenses. *Mossman*, 294 Kan. at 908. The challenged penalty is then questionable if more serious crimes are found to impose a less severe punishment. 294 Kan. at 908.

Hammond compares his penalty to those who have been convicted of second-degree murder under K.S.A. 21-3402, arguing that they receive a shorter period of postrelease supervision period. He claims the same is true for any other offenses classified as severity level 5 or 3.

But our Supreme Court has rejected this comparison to homicide crimes in aggravated indecent liberties cases. *State v. Swint*, 302 Kan. 326, 345, 352 P.3d 1014 (2015); see also *State v. Spear*, 297 Kan. 780, 801-02, 304 P.3d 1246 (2013) (rejecting comparison of homicide crimes to Jessica's Law crimes); *State v. Woodard*, 294 Kan. 717, 723, 280 P.3d 203 (2012) ("The fact that the penalty for certain categories of homicide may be less severe than the penalties for other, nonhomicide crimes does not automatically render the penalties for the nonhomicide crimes unconstitutional."). Hammond presents no new arguments, and we need not reexamine these well-established conclusions. For the same reasons, this factor does not favor Hammond.

3. *The third* Freeman *factor*

Under the final *Freeman* factor, this court must compare Hammond's penalty with punishments in other jurisdictions for the same offense. *Mossman*, 294 Kan. at 908.

Hammond argues other jurisdictions impose a lesser term of postrelease supervision compared to Kansas, referencing punishments from New Jersey, Tennessee, Colorado, and Missouri. In support, he cites *Mossman*, where our Supreme Court analyzed that "less than half of states provide for lifetime postrelease supervision of some or all sex offenders and, because several states have a mechanism for termination of the postrelease supervision under certain conditions, only a handful of states impose punishment as absolute as Kansas' requirement." 294 Kan. at 920.

But Hammond's reliance on *Mossman* is critically flawed. In *Mossman*, our Supreme Court, after its review of other jurisdictions, concluded that mandatory lifetime postrelease supervision of a violent sex offender does not constitute cruel and unusual punishment and specifically noted several cases in other states concluding the same. 294 Kan. at 919-21. Other decisions by our Supreme Court have found similarly. See *Cameron*, 294 Kan. at 894; *State v. Funk*, 301 Kan. at 942 (discussing *Mossman* and *Cameron* and finding "[t]he same analysis applies here").

Following our Supreme Court's repeated upholding of the lifetime postrelease supervision requirement for violent sex offenders under the third *Freeman* factor, we find this factor weighs against Hammond.

*Conclusion*

On balance, whether Hammond believes Jane consented to their relationship or not, his decision to engage in a sexual relationship with a 14-year-old was a serious one,

32

and our courts have historically treated a sex offense against a minor as a violent felony regardless of whether physical force was used. *Funk*, 301 Kan. at 942. Reviewing the record as a whole and weighing all three *Freeman* factors together, we find that substantial competent evidence supports the district court's legal decision that the imposition of lifetime postrelease supervision is not unconstitutional as applied to Hammond. We affirm Hammond's lifetime postrelease supervision as it is not so disproportionate that it shocks the conscience.

Affirmed.